Joan MOORE, Plaintiff,

v.

CITY OF OVERLAND PARK, Defendant.

Case No. 95–2341–JWL.

United States District Court,
D. Kansas.

Dec. 17, 1996.

Timothy J. Arehart, Olathe, KS and Yvonne M. Ernzen, Liberty, MO, for Plaintiff.

Henry E. Couchman, Jr. and Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendant.

### *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

### I. *Introduction.*

This employment discrimination case comes before the court on the defendant's motion (Doc. # 56) for summary judgment pursuant to Fed.R.Civ.Pro. 56(c) and the

plaintiff's motion to reconsider (Doc. # 83) pursuant to Fed.R.Civ.Pro. 60(b). In her complaint, the plaintiff asserts three claims: disability discrimination; age discrimination; and retaliation for engaging in activity protected under the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). In its summary judgment motion, the defendant argues (1) that the plaintiff has failed to show a causal connection between her protected activity and the defendant's allegedly retaliatory conduct, (2) that the plaintiff failed to exhaust her administrative remedies with respect to her claim that she was discriminated against because of her alleged nicotine addiction and central nervous disorder, (3) that the plaintiff is not an "individual with a disability" within the meaning of the ADA or the RA, and (4) that the defendant hired Ms. Kelly Delancy, and not the plaintiff, for the Enforcement Specialist I (ES–I) position based on a legitimate, non-discriminatory reason. For the reasons discussed below, the defendant's motion for summary judgment is granted with respect to the plaintiff's retaliation and disability discrimination claims and denied with respect to the plaintiff's age discrimination claim.

## II. Facts.

The following facts are either uncontroverted or, if controverted, construed for the purposes of resolving this motion in the light most favorable to the plaintiff. In February of 1983, the defendant hired the plaintiff as a clerk typist in the Housing and Grants Division of the Community Services Department (HGD). During her tenure with the HGD, the plaintiff received the following promotions: Housing Assistant in January of 1984; Housing Associate in August of 1987; and Housing Coordinator[1] in November of 1989. In March of 1993, the defendant transferred its Section Eight Housing Assistance Payments Program (HAPP), on a contract basis, to Johnson County, Kansas. As a result of this transfer, the defendant informed the four HGD–HAPP employees (the plaintiff, Ms. Florence Erickson[2], Ms. Kerry Hackney[3], and Ms. Vickie Burnett[4]) that it was abolishing the HGD and that they would be terminated if they did not obtain alternative employment with the defendant.

On March 26, 1993, Mr. Roger Peterson, Director of Planning and Research, and Mr. Bob Jones, Human Resource Director, met with the affected employees, including the plaintiff, to discuss the defendant's willingness to help them find new positions. In a memorandum dated April 9, 1993, Mr. Jones summarized the items discussed at the March 26 meeting and indicated, among other things, that the defendant would continue to notify the affected employees of any job vacancies for up to six months after the date of separation.

The plaintiff applied for an ES–I position and a Victim Assistance Program Coordinator (VAPC) position.[5] Mr. Peterson contacted Judge Crosett, an Overland Park Municipal Court Judge, concerning the VAPC position and requested that Judge Crosett interview and give strong consideration to the plaintiff. Mr. Peterson also offered to contact the person interviewing her for the ES–I position. The plaintiff told him that she did not think it was necessary.

The job announcement for the ES–I position stated, in pertinent part,

The responsibilities of this position include performing field inspections to identify code violations, explaining code requirements to residents and property owners, and taking appropriate steps to ensure code compliance. This job requires the ability to work well with the general public and to communicate effectively, both orally

---

1. As Housing Coordinator, the plaintiff was responsible for case management of the defendant's Section 8 housing program.

2. Ms. Erickson was the administrator of the HGD.

3. Ms. Hackney was Ms. Erickson's part-time secretary.

4. Ms. Burnett was an Administrative Clerk in the HGD.

5. The plaintiff believed that she was qualified for other open positions, but she chose not to apply for them because they were not within her salary range.

and in writing. Past work experience with a high degree of public contact is very desirable, particularly in a government or regulatory setting. Experience or educational training in neighborhood planning would also be beneficial. A valid driver's license and safe driving record is required. The ES–I position description stated the following qualifications:

(1) Basic education which includes courses in communication and analytical applications or additional equivalent experience. College courses with an emphasis on planning or public administration preferred.

(2) One year experience in a position involving direct public contact. Government regulatory or code enforcement experience preferred.

(3) Excellent oral and written communication skills.

(4) Ability to (a) read and comprehend city, state, and federal regulations, (b) exhibit diplomacy and judgment when dealing with the public, government officials, and co-workers, (c) assess situation when on an inspection and use judgment in responding, (d) work and conduct inspections independently, (e) adapt to a changing environment, and (f) communicate in writing clearly and succinctly.

(5) Ability to (a) make and receive phone calls, (b) travel and inspect City sites, (c) withstand extreme environmental conditions, (d) drive city vehicle, (e) visually inspect site or object, (f) appear in court and testify as required, (g) speak to an individual or group for an extended period of time, and (h) lift 20 pounds and transport 50 feet.

(6) Data entry skills for computer access.

Mr. Doug Johnson and Ms. Sue Wildgen conducted the interviews for the ES–I position.[6] The interviewers asked the candidates questions about their work experience, contact with the public, problem resolution, how they would respond in certain hypothetical situations, and how they would approach the general responsibilities of code enforcement. The candidates were also asked to describe their current position with the defendant and the skills used in that position that they thought would be transferable to the ES–I position. Throughout the plaintiff's thirty minute interview, no one ever made any comments or asked any questions concerning the plaintiff's alleged disabilities or age.

After hearing the recommendations from Mr. Johnson and Ms. Wildgen, Mr. Peterson offered the open ES–I position to Ms. Carol McCoy, who declined. As a result, Mr. Peterson offered the open ES–I position to Ms. Kelly Delancy. She accepted. Prior to being offered the open ES–I position, Ms. Delancy had worked for three summers as a seasonal Weed Inspector, which involved enforcing city ordinances on excessive vegetation.

On August 13, 1993, the plaintiff's position was eliminated and her employment terminated as a result of her inability to find another position with the defendant. After the plaintiff's termination, the defendant never notified her of any job vacancies. However, the plaintiff never requested such notices. Moreover, the plaintiff was aware of and failed to call the defendant's jobs hot-line or check the job availability postings on the Overland Park Community Center's bulletin board. On October 20, 1993, the plaintiff filed a charge of discrimination with the Kansas Human Rights Commission and the Equal Employment Opportunity Commission (EEOC) alleging that the defendant discriminated against her based on her age and disability (diabetes) when it hired someone else for the ES–I and the VAPC positions. On May 10, 1995, the EEOC issued a determination stating that "... the evidence obtained during the investigation does not establish a violation of the ..." ADEA or ADA.

### III. Standard for summary judgment

When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.Pro. 56(c);

---

**6.** The defendant only considered internal applicants for this position.

*Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-movant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## IV. Discussion.

### A. Retaliation.

In order to establish a prima facie case of retaliation in violation of the ADEA, the ADA, and the RA, the plaintiff must show (1) that she engaged in activity protected under the ADEA, the ADA, and the RA, (2) that she suffered an adverse employment action subsequent to or contemporaneous with such protected activity, and (3) that there is a causal connection between her protected activity and her employer's adverse employment action. *Corneveaux v. Cuna Mut. Ins. Group,* 76 F.3d 1498, 1507 (10th Cir.1996) (ADEA retaliation); *Burnett v. Western Resources, Inc.,* 929 F.Supp. 1349, 1359 (D.Kan.1996) (ADA retaliation); *Starr v. Shalala,* No. 93–1398, 1995 WL 333839 at *4 (D.N.M. Mar 24, 1995) (RA retaliation) (citing 29 C.F.R. § 1614.101(b)).

The plaintiff contends that the defendant retaliated against her after she filed a charge of discrimination on October 20, 1993, by not notifying her of job openings as it had promised. In support of her claim, the plaintiff argues that Mr. Jones' memorandum, dated April 9, 1993, obligated the defendant to notify the plaintiff of any job vacancies for up to six months after her discharge. The defendant contends that the plaintiff's prima facie case fails because the defendant was engaging in its allegedly retaliatory conduct (not sending notices) before the plaintiff engaged in any protected activity and because the plaintiff had easy independent access to the information the plaintiff alleges the defendant was concealing from her.

Construing the facts in a light most favorable to the plaintiff, the court concludes that the plaintiff cannot state a prima facie case of retaliation. Assuming that the April 9 memorandum required the defendant to send the plaintiff notices of job openings, the plaintiff's prima facie case of retaliation still fails. The plaintiff has produced no evidence demonstrating that there were job openings available during the time period in question. Without evidence of job openings during the relevant period, the plaintiff cannot demonstrate that the defendant engaged in any retaliatory conduct. Moreover, the plaintiff was aware of easily accessible, independent sources of the information she alleges the defendant withheld in retaliation for her protected activity. Specifically, the defendant points to the fact that the plaintiff was aware that she could have obtained information concerning job vacancies with the defendant by calling the defendant's job hotline or by looking at the defendant's job postings on the Overland Park Community Center's bulletin board. Finally, the plaintiff also fails to demonstrate how conduct in which the defendant is already engaging can be causally connected to the plaintiff's subsequent protected activity. The court recognizes that the defendant's motivation behind its allegedly retaliatory conduct could have changed as a result of the plaintiff's protect activity. However, there is no evidence from which a reasonable factfinder could conclude that such a motivational change occurred in this case. Thus, because the plaintiff has failed to set forth specific facts showing that there is a genuine issue for trial concerning her retaliation claim, the court grants the defendant's motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

### B. Disability discrimination.

#### 1. Exhaustion of administrative remedies.

The ADA consists of different titles. Title I proscribes the discrimination by a "covered entity" against "a qualified individual with a disability because of the disability" in all terms, conditions and privileges of employment. 42 U.S.C. § 12112(a). In contrast, Title II prohibits a "public entity" from discriminating against "a qualified individual with a disability" because of the disability in all "services, programs or activities of . . . [the] public entity." 42 U.S.C. § 12133. Each title has its own enforcement section. While Title I adopts Title VII procedures, 42 U.S.C. § 12117(a), Title II adopts the remedies, rights, and procedures of the RA, 29 U.S.C. § 794a, 42 U.S.C. § 12133. Under Title VII, filing a charge of discrimination with the EEOC is a condition precedent to suit. *Million v. Frank*, 47 F.3d 385, 389 (10th Cir.1995) (citations omitted).

■ "There are two purposes behind the requirement for administrative exhaustion in discrimination cases: 1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994) (citations omitted). "In this circuit, '[w]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC.'" *Id.*

■ In this case, the plaintiff alleges that the defendant discriminated against her based on her disabilities (diabetes, nicotine addiction, and a central nervous disorder) when it hired Ms. Delancy, and not the plaintiff, for the open ES–I position. However, the only disability the plaintiff identified in her charge of discrimination and her EEOC affidavit was diabetes. The defendant contends that the plaintiff is barred from asserting that the defendant discriminated against her based upon her alleged nicotine addiction and central nervous disorder because she failed to mention those disabilities in her charge of discrimination, thereby not exhausting her administrative remedies. The plaintiff contends that her claims based on these alleged disabilities are not barred because (1) her nicotine addiction and central nervous disorder are like or reasonably related to her allegations in her charge of discrimination, (2) these disability claims occurred contemporaneously with the disability claim she made in her charge of discrimination, and (3) both the EEOC and the defendant had notice of these disability claims.

Construing the facts in a light most favorable to the plaintiff, the court concludes that the plaintiff's disability claims based on her alleged nicotine addiction and central nervous disorder are barred based on the fact that the plaintiff failed to exhaust her administrative remedies. It is uncontroverted that the plaintiff did not assert in her charge of discrimination or in any other document provided to the EEOC that the defendant discriminated against her because of her alleged nicotine addiction or a central nervous disorder. The plaintiff offers no basis from which the court could conclude that her disability discrimination claim based on her diabetes is like or reasonably related to her disability discrimination claims based on her alleged nicotine addiction or central nervous disorder. Based on this evidentiary shortcoming, the court concludes that the plaintiff failed to exhaust her administrative remedies with respect to her disability claims based on her alleged nicotine addiction and central nervous disorder. *Ingels*, 42 F.3d at 625. As a result, the court grants the defendant's motion for summary judgment with respect to the plaintiff's disability claims based on her alleged nicotine addiction and central nervous disorder. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514.

#### 2. Disability under ADA.

In order to state a prima facie case of disability discrimination under the ADA, the plaintiff must establish: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, that is, with or without reasonable accommodation (which

she must describe) she is able to perform the essential functions of the job; and (3) that the employer terminated her because of her disability. *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995).

The ADA defines the term "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The ADA does not define the term "major life activities," but the Tenth Circuit has found that the EEOC regulations issued to implement it, 29 C.F.R. § 1630, are instructive. *See Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir.1994). "The term 'means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'" *Id.* (citing 29 C.F.R. § 1630.2(i)). The *Bolton* court concluded that three factors should be considered when determining whether an impairment substantially limits a major life activity of an individual: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. *Id* at 943.

■ To demonstrate that an impairment substantially limits the major life activity of working, an individual must show "significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The inability to perform a single, particular job is insufficient. *Id.; Bolton*, 36 F.3d at 942; *see also Welsh v. City of Tulsa*, 977 F.2d 1415, 1417, 1419 (10th Cir.1992) (While major life activity includes working, it does not necessarily mean working at the job of one's choice. An impairment that an employer perceives as limiting an individual's ability to

perform only one job is not a handicap under the Rehabilitation Act [7]).

In addition to the three factors already discussed (nature and severity, duration, long-term impact), the Tenth Circuit has indicated that three other factors may be considered when determining whether a plaintiff has shown a substantial limitation in the major life activity of working: (1) the geographical area to which the individual has reasonable access; (2) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or (3) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes). *Bolton*, 36 F.3d at 943; 29 C.F.R. § 1630.2(j)(3)(ii).

■ The defendant contends that the plaintiff's diabetes does not constitute a disability within the meaning of the ADA. Specifically, the defendant argues that there is no evidence that the plaintiff's diabetes substantially limits any of her major life functions. In response, the plaintiff contends that her diabetes does substantially limit her working, a major life activity as defined under 29 C.F.R. § 1630.2(i), based on the fact that she had to test her blood sugar every day at work and on the following symptoms allegedly caused by her diabetes: weakness, shakiness, blurred vision, dizziness, and a clammy feeling.

■ Construing the facts in a light most reasonable to the plaintiff, the court concludes that the plaintiff is not disabled within the meaning of the ADA. In *Murphy v. United Parcel Service, Inc.*, 946 F.Supp. 872 (D.Kan.1996), United States District Judge

---

7. The ADA expressly requires its provisions to be interpreted in a way that "prevents imposition of inconsistent or conflicting standards for the same requirements" under the Rehabilitation Act of 1973. *White v. York Int'l Corp.*, 45 F.3d 357, 360 n. 5 (10th Cir.1995) (citing 42 U.S.C. § 12117(b)).

Sam Crow discussed the issue of whether diabetes is a disability as defined under the ADA. In *Murphy*, the plaintiff relied on EEOC Interpretative Guideline § 1630.2(j)[8] for the proposition that a court must look at diseases, such as diabetes, in their pre-medicated states in order to determine whether they are disabilities under the ADA. Judge Crow rejected EEOC Interpretative Guideline § 1630.2(j)'s pre-medicated perspective because it conflicts with the plain language of the ADA, which requires an ADA plaintiff to show that his or her impairment "substantially limits" a major life function. *Id.* at 879–80; *Deckert v. City of Ulysses, Kan.*, No. 93–1295, 1995 WL 580074 at *6–7 (D.Kan. Sept. 6, 1995) (Kelly, J.). Judge Crow reasoned,

Although agency interpretations are to be given deference, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 [104 S.Ct. 2778, 81 L.Ed.2d 694] (1984), in this instance the EEOC's interpretation is in direct conflict with the language of the statute that requires plaintiffs in ADA cases to show that an impairment "substantially limits" their lives. 42 U.S.C. § 12102(2)(A); *see Public Employees Retirement System v. Betts*, 492 U.S. 158, 171 [109 S.Ct. 2854, 2863–64, 106 L.Ed.2d 134] (1989) ("[O]f course no deference is due to agency interpretations at odds with the plain language of the statute itself."). If an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

*Murphy*, 946 F.Supp. at 880–81 (quoting *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1445 (W.D.Wis.1996)). This court concurs that EEOC Interpretative Guideline § 1630.2(j)'s pre-medicated per-

spective is in direct conflict with the ADA's express statutory language requiring that the impairment substantially limit an individual's major life function in order to constitute a disability under the ADA.

Having concluded that the plaintiff's diabetes should be evaluated in its medicated state, the court must now determine whether the plaintiff has presented sufficient evidence from which a reasonable factfinder could conclude that her diabetes constituted a disability under the ADA. In her deposition, the plaintiff indicated that as long as she took her medication and followed her diet, she had no symptoms from her diabetes and that she did not believe that her work suffered because of her diabetes. Thus, the court concludes that there is no evidence from which a reasonable factfinder could conclude that the plaintiff's diabetes substantially limited the plaintiff's ability to work. *See Deckert*, 1995 WL 580074 at *7; *See also Chandler v. City of Dallas*, 2 F.3d 1385, 1390–91 (5th Cir. 1993), *cert. denied*, 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). As a result, the court grants the defendant's summary judgment motion with respect the plaintiff disability claim based on her diabetes. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514.

## C. Age Discrimination.

### 1. Standard.

Absent direct or circumstantial evidence of age discrimination, the court analyzes disparate treatment cases according to the shifting burden of proof scheme initially articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 560–63 (10th Cir.1996); *Thomas v. Int'l Business Machines*, 48 F.3d 478, 484 (10th Cir.1995). Under this standard, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824. A prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employ-

---

**8.** EEOC Interpretative Guideline § 1630.2(j) provides, in pertinent part,

Similarly, a diabetic who without insulin would lapse into a coma would be substantially

limited because the individual cannot perform major life activities without the aid of medication.

ee. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

Once a prima facie case is established, the burden of production shifts to the defendant to show a legitimate, non-discriminatory reason for the decision. *Hicks*, 509 U.S. at 506–08, 113 S.Ct. at 2747. The ultimate burden of persuasion remains with the plaintiff to show that unlawful discrimination was the true reason for the adverse action. *Id.* at 506–10, 113 S.Ct. at 2747–48. If the defendant articulates a legitimate, non-discriminatory reason, the presumption of discrimination established by the prima facie showing "drops out of the picture." *Id.* at 510–11, 113 S.Ct. at 2749.

■■■■ If the defendant proffers a valid reason for the challenged conduct, the plaintiff must offer evidence that the defendant's proffered reasons were really a pretext for illegal conduct. *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir.1995). "At the summary judgment stage, if the plaintiff produces both a prima facie case and evidence supporting a finding that 'defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder.' " *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir.1994)); *see Durham v. Xerox Corp.*, 18 F.3d 836, 839–40 (10th Cir.1994) ("Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer discrimination, and thus preclude summary judgment for the employer."). The plaintiff's mere conjecture that his or her employer's explanation is a pretext for discrimination is not sufficient to meet the plaintiff's evidentiary burden. *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988). Failure by the plaintiff to come forward with evidence of pretext, however, will entitle the defendant to judgment. *Cone*, 14 F.3d at 529; *see Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir.1993) ("If no facts relating to the pretextuality of the defendant's action remain in dispute, summary judgment is appropriate.").

### 2. *Analysis.*

■■■■ For purposes of this motion, the defendant admits that the plaintiff can state a prima facie case of age discrimination. *Defendant's motion*, at 33. However, the defendant contends that it hired Ms. Delancy, and not the plaintiff, based on the legitimate, non-discriminatory reason that Ms. Delancy was more qualified for the ES–I position than the plaintiff. The court recognizes that it is not its function to determine whether the defendant's decision to hire Ms. Delancy instead of the plaintiff was a good or bad business decision. *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir.1993). The ADEA is not violated by the exercise of erroneous or even illogical business judgment. *See id.* However, the defendant's decision to hire Ms. Delancy instead of the plaintiff is relevant insofar as it relates to the defendant's motivation with respect to its allegedly illegal discriminatory conduct. *Id.* ("It is conceivable that a plaintiff in a case such as this could be so overwhelmingly better qualified than another applicant that on this evidence alone a trial court could properly find pretext and intent to discriminate.") Therefore, for that purpose only, the court must compare the qualifications of Ms. Delancy and the plaintiff.

In support of Ms. Delancy's qualifications, the defendant offers the following evidence: (1) the EEOC's determination that Ms. Delancy was "well-qualified" for the ES–I position; (2) while a Weed Inspector for three summers, Ms. Delancy had engaged in activities similar to the duties of an ES–I, such as enforcing City codes and resolving complaints from citizens; (3) as a Weed Inspector, Ms. Delancy was familiar with ES–I internal office procedures because she had worked in the same office with enforcement specialists; (4) as a Weed Inspector, Ms. Delancy accompanied ES–Is on inspections and attended staff meetings during which various code enforcement issues were discussed; (5) as a Weed Inspector, Ms. Delancy was proficient with OPCARES computer system, which is used by enforcement specialists to track excessive vegetation and other property maintenance complaints; and (6)

Ms. Delancy's responses to questions in her interview reflected a customer service orientation to code enforcement. In support of its contention that Ms. Delancy was more qualified for the ES–I position than the plaintiff, the defendant offers the following evidence: (1) Ms. Delancy was more familiar with code enforcement procedures and the requirements of the ES–I position; (2) unlike Ms. Delancy, the plaintiff was not familiar with the OPCARES computer system; (3) Ms. Delancy had more experience enforcing codes in response to complaints from the public; and (4) unlike Ms. Delancy, during her interview, the plaintiff did not exhibit good communication skills.

In response, the plaintiff contends that the defendant's purported legitimate, non-discriminatory reason is not worthy of belief because the plaintiff was more qualified for the ES–I position than Ms. Delancy. In support of her argument, the plaintiff contends that the defendant was aware of the following evidence when it hired Ms. Delancy for the ES–I position. First, as a Weed Inspector, Ms. Delancy enforced the weed ordinance, which is separate and distinct from the property maintenance code, had neither conducted nor participated in a property maintenance inspection, and "fairly rarely" accompanied an ES–I on an inspection.[9] Moreover, Ms. Delancy's inspection experience constituted mostly driving by a property in order to determine whether the vegetation was over 10 inches tall or whether a violator had complied by cutting his or her excess vegetation. In contrast, the plaintiff had conducted property maintenance inspections[10], actively participated in inspections conducted by ES–Is, and trained inspectors. The plaintiff also enforced the property maintenance code by determining whether a property passed, by representing the defendant at hearings, by negotiating with HAPP clients, and by providing quality control oversight to make sure the same standards were applied in the field. Second, Ms. Delancy testified in her deposition that as a Weed Inspector, she did not resolve many complaints because there is really not a complaint resolution process involved in getting excess vegetation cut. In contrast, the plaintiff wrote the HAPP Administrative Plan and Program Handbook, received complaints, scheduled inspections, prepared reports and contracts, and drafted correspondence to her clients. Third, knowledge of the OPCARES computer system[11] was not a requirement of the ES–I position. Moreover, the plaintiff possessed the same data entry experience as Ms. Delancy. Fourth, contrary to the alleged conclusions of her interviewers, the plaintiff's co-workers and supervisor testified through deposition and affidavit that people skills were one of the plaintiff's strengths. Fifth, after her placement in the ES–I position, Ms. Delancy's supervisors testified that she lacked maturity and that she needed to improve in the area of productivity. Sixth, the plaintiff attended many of the same staff meetings Ms. Delancy attended.

Construing the facts in a light most favorable to the plaintiff, the court concludes that the plaintiff has produced sufficient evidence from which a reasonable factfinder could conclude that the defendant's purported legitimate, non-discriminatory reason is a pretext for illegal age discrimination. The uncontroverted evidence demonstrates that the plaintiff had considerably more relevant experience than Ms. Delancy in the following areas: property maintenance investigation, code enforcement, working with ES–Is, and handling public complaints. The uncontroverted evidence also indicates that the OPCARES system was not a prerequisite for the ES–I position and that it was a very simplistic system which the plaintiff could have easily and quickly learned. With respect to the defendant's contention that Ms. Delancy's interview responses reflected a more customer service oriented style, the defendant fails to

---

**9.** Ms. Delancy testified in her deposition that when she did accompany an ES–I, she did not participate in the inspection process.

**10.** While at HAPP, the plaintiff engaged in more thorough inspections than required by the property maintenance code based on the fact that HAPP inspections focus on the interior and exterior of the property rather than a specific violation identified in a complaint.

**11.** The plaintiff provides uncontroverted evidence indicating that the OPCARES computer system was easy to learn.

articulate, beyond a general sense, how Ms. Delancy's interview responses differed from the plaintiff's interview responses. Moreover, the plaintiff has presented uncontroverted evidence indicating that the plaintiff had strong people skills. Based on this evidence, the court concludes that a reasonable factfinder could conclude that the plaintiff was overwhelmingly better qualified than Ms. Delancy for the ES–I position and, as a result, the defendant's purported legitimate, non-discriminatory reason is pretextual. *Sanchez*, 992 F.2d at 247. As a result, the court denies the defendant's motion for summary judgment with respect to the plaintiff's age discrimination claim. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514.

## V. *Motion to reconsider.*

The plaintiff requests that the court reconsider its order dated November 22, 1996, denying her motion to file a surreply. The plaintiff contends that the defendant raised new allegations and arguments in its reply brief. Because the court does not rely on any of the "newly raised" allegations, arguments, or evidence in reaching its decision, the court denies the plaintiff's motion as moot.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion for summary judgment (Doc. # 56) is granted with respect to the plaintiff's retaliation and disability discrimination claims and denied with respect to the plaintiff's age discrimination claim.

**IT IS FURTHER ORDERED** that the plaintiff's motion to reconsider (Doc. # 83) is denied as moot.

**IT IS SO ORDERED.**